# United States District Court

### _____ MIDDLE _____ DISTRICT OF _____ ALABAMA _____

In the matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

**77 Ole Creek Road**
**Pittsview, Alabama**

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT
CASE NUMBER: 3:07 mj 93-S RW

I ____ Stephen E. McCraney _____ being duly sworn depose and say:

I am a(n) __ Special Agent, Federal Bureau of Investigations ____ and have reason to believe

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

### 77 Ole Creek Road, Pittsview, Alabama

in the _____ Middle _____ District of ____ Alabama _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

### See Attachment A

which is (state one or more bases for search set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

### pertaining to the illegal production, distribution, receipt, and possession of child pornography

concerning a violations of Title 18, United States Code, Sections 2252(a) and 2252A.

The facts to support the issuance of a Search Warrant are as follows:

### See Attached Affidavit

Continued on the attached sheet and made a part hereof:     ☒ Yes     ☐ No

_Stephen E. McCraney_
Signature of Affiant

Sworn to before me and subscribed in my presence,

**10/11/07** _____ at
Date

__ Montgomery, Alabama _____
City and State

__ Susan Russ Walker, U.S. Magistrate Judge __
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Stephen E. McCraney, state as follows:

1.  Affiant, Stephen E. McCraney, is employed as a Special Agent with the Federal Bureau of Investigation (FBI), and has been so employed for approximately 1.5 years. Prior to employment with the FBI, I was employed as a Police Officer with the City of Jackson, Tennessee from 1998 to 2003. During this employment I served from 2001 to 2003 as an FBI Task Force Officer in an Organized Crime Drug Enforcement Task Force (OCDETF). I was also employed by the Rutherford County Sheriff's Department in Murfreesboro, Rutherford County, Tennessee for approximately ten months from 2003 to 2004 as a Deputy Sheriff. I am currently assigned to the Opelika Resident Agency, located in the Middle District of Alabama. As part of my duties, I investigate child exploitation offenses, including the collection and dissemination of child pornography by use of computer over the Internet. Such investigations are typically predicated on information provided to me by other law enforcement officials.

2.  I have been in contact with Detective Philippe Dubord, who is employed by the Hillsborough County (Florida) Sheriff's Office (hereafter HCSO), who through conversations and other means advised me as follows:

A.  Detective Dubord has been employed with the Hillsborough County Sheriff's Office (HCSO) since November 1, 1984. Since November, 1992, he has been assigned as a detective to the organized crime bureau of the HCSO. From November, 1998 to the present, Detective Dubord has been assigned to the FBI Innocent Images Task Force, members of which investigate the sexual exploitation of children. He has been involved in numerous investigations involving the exploitation of children, including offenses involving the dissemination of child pornography on the Internet via computer. Detective Dubord has

1

attended numerous specialized courses involving computers and child exploitation, and has provided specialized training to local and federal law enforcement officers. On August 10, 1999, Detective Dubord was sworn in by the United States Marshal's Service as a Special Deputy.

B.     As a Task Force Agent, Detective Dubord is authorized to investigate violations of laws of the United States, and is a law enforcement officer with authority to execute arrest and search warrants issued under the authority of the United States.

3.     The statements contained in this affidavit are based on my own knowledge, training, information and belief, as well as that of Detective Dubord, and information provided to me by other law enforcement officers. This affidavit is being submitted for the limited purpose of securing a search warrant, and I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of violations of Title 18, United States Code, Section 2252A is located at 77 Ole Creek Road, Pittsview, Russell County, Alabama, which is in the Middle District of Alabama.

## STATUTORY AUTHORITY

4.     This investigation concerns alleged violations of Title 18, United States Code, Sections 2252 and 2252A, relating to material involving the sexual exploitation of minors:

a.     18 U.S.C. § 2252(a)(1) prohibits a person from knowingly transporting or shipping in interstate or foreign commerce, by computer or mail, any visual depiction of minors engaging in sexually explicit conduct. Under 18 U.S.C. § 2252(a)(2), it is a federal crime for any person to knowingly receive or distribute, by computer or mail, any visual depiction of minors engaging in sexually explicit conduct that has been mailed or shipped or

2

transported in interstate or foreign commerce. That section also makes it a federal crime for any person to knowingly reproduce any visual depiction of minors engaging in sexually explicit conduct for distribution in interstate or foreign commerce by any means, including by computer or the mail. Under 18 U.S.C. § 2252(a)(4), it is also a crime for a person to possess one or more books, magazines, periodicals, films, or other materials which contain visual depictions of minors engaged in sexually explicit conduct that have been transported in interstate or foreign commerce or that were produced using materials that had traveled in interstate or foreign commerce.

   b.  18 U.S.C. § 2252A(a)(1) prohibits a person from knowingly mailing, transporting, or shipping child pornography in interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(2) prohibits a person from knowingly receiving or distributing any child pornography that has been mailed or shipped or transported in interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(3) prohibits a person from knowingly reproducing child pornography for distribution through the mail or in interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly possessing any book, magazine, periodical, film, videotape, computer disk, or other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

5.    The following definitions apply to this Affidavit and Attachment A to this Affidavit:

a.    "Child Erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

b.    "Child Pornography," as used herein, includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct (see, 18 U.S.C. §§ 2252 and 2256(2)).

c.    "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See, 18 U.S.C. § 2256(5).

d.    "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons.  See, 18 U.S.C. § 2256(2).

4

e.    "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

f.    "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.   Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g.    "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form.   It commonly includes programs to run operating systems, applications, and utilities.

h.    "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

i.    "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation,

or data.   Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.   Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which preform certain pre-set security functions when touched.   Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

j.      "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet.  IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet.   IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

k.      The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers,

6

smart cards, memory calculators, electronic dialers,   or electronic notebooks, as well as digital

data files and printouts or readouts from any magnetic, electrical or electronic storage device).

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

6.     Computers and computer technology have revolutionized the way in which

individuals interested in child pornography interact with each other.   Child pornography formerly

was produced using cameras and film (either still photography or movies).   The photographs

required darkroom facilities and a significant amount of skill in order to develop and reproduce the

images.   There were definable costs involved with the production of pornographic images.   To

distribute these on any scale required significant resources.   The photographs themselves were

somewhat bulky and required secure storage to prevent their exposure to the public.   The

distribution of these wares was accomplished through a combination of personal contacts,

mailings and telephone calls.

7.     The development of computers has changed this.   Computers basically serve four

functions in connection with child pornography:   production, communication, distribution, and

storage.

8.     Child pornographers can now transfer photographs from a camera onto a

computer-readable format with a device known as a scanner.   With the advent of digital cameras,

the images can now be transferred directly onto a computer.   A device known as a modem allows

any computer to connect to another computer through the use of telephone, cable, or wireless

connection.   Electronic contact can be made to literally millions of computers around the world.

9.     The computer's ability to store images in digital form makes the computer itself an

ideal repository for child pornography.   The size of the electronic storage media (commonly

referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution.

10.    The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

11.    Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

12.    A growing phenomenon on the Internet is peer to peer file sharing (P2P). P2P file sharing is a method of communication available to Internet users through the use of special software. Computers linked together through the Internet using this software form a network that allows for the sharing of digital files between users on the network. A user first obtains the P2P software, which can be downloaded from the internet. In general, P2P software allows the user to set up file(s) on a computer to be shared with others running compatible P2P software. A user obtains files by opening the P2P software on the user's computer, and conducting a search for files that are currently being shared on the network. "Limewire", one type of P2P software, sets up its searches by keyword. The results of the keyword search are displayed to the user. The user then

selects file(s) from the results for download.   The download of a file is achieved through a direct connection between the computer requesting the file and the computer containing the file.

13.    For example, a person interested in obtaining child pornographic images would open the P2P application on his/her computer and conduct a search for files using a term such as "preteen sex."   The search is sent out over the network of computers using compatible P2P software.   The results of the search are returned to the user's computer and displayed.   The user selects from the results displayed the file(s) he/she wants to download.   The file is downloaded directly from the computer hosting the file.   The downloaded file is stored in the area previously designated by the user.   The downloaded file will remain there until moved or deleted.

14.    One of the advantages of P2P file sharing is that multiple files may be downloaded in parallel.   This means that the user can download more than one file at a time.   In addition, a user may download parts of one file from more than one source computer at a time.   For example, a "Limewire" user downloading an image file may actually receive parts of the image from multiple computers.   The advantage of this is that it speeds up the time it takes to download the file.   Often, however, a "Limewire" user downloading an image file receives the entire image from one computer.

15.    A P2P file transfer is assisted by reference to an Internet Protocol (IP) address. This address, expressed as four numbers separated by decimal points, is unique to a particular computer during an online session.   The IP address provides a unique location making it possible for data to be transferred between computers.

16.    Third party software is available to identify the IP address of the P2P computer sending the file and to identify if parts of the file came from one or more IP addresses.   Such software monitors and logs Internet and local network traffic.

9

17.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.   Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.   Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).   In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.   A forensic examiner often can recover evidence suggesting whether a computer contains P2P software, when the computer was sharing files, and some of the files which were uploaded or downloaded.   Such information is often maintained indefinitely until overwritten by other data.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

18.     Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.     Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information.   Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names.   This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.   This sorting process can take days or weeks,

depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site; and

   b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

   19. In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit (CPU). In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media).

   20. In addition, there is probable cause to believe that the computer and its storage devices, the monitor, keyboard, and modem are all instrumentalities of the crime(s), within the meaning of 18 U.S.C. §§ 2251 through 2256, and should all be seized as such.

## COMPUTER EXAMINATION METHODOLOGY TO BE EMPLOYED

21.    The procedure to be used in examination of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, and other examination procedures may be used):

a.    examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

b.    searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.    surveying various file directories and the individual files they contain;

d.    opening files in order to determine their contents;

e.    scanning storage areas;

f.    performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment A; and/or

g.    performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment A.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

22.    Based on your affiant's experience and  training, as well as that of Detective Dubord, the following traits and characteristics are generally found to exist and be true in cases involving individuals who collect child pornography:

a.    A majority of individuals who collect child pornography are persons who have a sexual attraction to children.   They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

b.    A majority of individuals who collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. Most of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their deviant sexual fantasies involving children.

c.    Many individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. This contact also helps these individuals rationalize and validate their deviant sexual interest and associated behavior.   The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, P2P, e-mail, e-mail groups, bulletin boards, IRC, newsgroups, instant messaging, and other similar vehicles.

d.    Many individuals who collect child pornography maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children,

13

justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals rarely destroy these materials because of the psychological support they provide.

      e.     Many individuals who collect child pornography collect, read, copy or maintain names, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

      f.     The majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials. They almost always maintain their collections in the privacy and security of their own homes or other similarly familiar and secure location.

## BACKGROUND OF THE INVESTIGATION

23.     On July 11, 2006, Detective Dubord, in his capacity as a Task Force Officer (TFO) and working in an undercover capacity, accessed the Internet and connected to the Gnutella network by launching the EP2P Limewire program from the Federal Bureau of Investigation. TFO Dubord conducted a keyword search using the term "5yo." TFO Dubord previously learned that the term "5yo" is part of file names associated with known child pornography files traded/shared on the Gnutella network. TFO Dubord found approximately one hundred seventy-six (176) files associated with the search term "5yo". TFA Dubord was able to connect to the computer assigned IP address "172.165.151.218" and located forty-eight (48) files available to

others for downloading and viewing on the computer.   TFA Dubord then downloaded three image files which depict child pornography.   These three files are named and briefly described as:

1. *5yofuck.jpg*, which depicts what appears to be an adult male inserting his penis into the vagina of a prepubescent female.

2. *pedo baby 03 - 2yo photos 11.jpg*, which depicts what appears to be an adult male ejaculating onto the vagina of an infant female.

3. *pedo my little 5yo boy sucking dad's boner.jpg*, which depicts what appears to be a prepubescent child with an adult male's penis in his/her mouth.

24.    Your affiant personally viewed the above-mentioned images downloaded by TFA Dubord and believes that all three images depict a minor engaged in sexually explicit activity, as defined in Title 18 U.S.C. § 2256(8).

25.    TFA Dubord used an online database, American Registry for Internet Numbers (ARIN) to determine who owns IP address "172.165.151.218", and learned that the IP address belongs to America Online (AOL).

26.    An administrative subpoena was then sent to AOL for information relating to IP address "172.165.151.218", specifically relating to the time during which TFA Dubord conducted his undercover online activities as described above.   Results from the administrative subpoena revealed that the IP address was assigned to the account subscribed to by Tim Boyett.   The results further indicated account subscriber information as:

| | |
|---|---|
| **Account Name:** | Tim Boyett |
| **Account Number:** | 077-0820-427 |
| **Service Address:** | 77 Ole Creek Road, Pittsview, Alabama 36871 |
| **Telephone:** | 334/855-9306 (Day or Evening) |
| **Billing Info:** | Master (call), Timothy A. Boyett, Bill date 22nd |
| **Screen Names:** | timmaddog64, frozensun700, redshadow1321322, jazzygirl6194, mjb91466 |
| **Products:** | Narrow band |
| **Member Since:** | May 22, 2004 |

15

The results of an administrative subpoena sent to America Online revealed that screen name "redshadow1321322" was logged on during the time TFA Dubord downloaded the image files. According to America Online this account is currently active.

27.   On October 3, 2007  your affiant conducted searches of public records, and obtained Alabama Driver's License information through the Alabama Law Enforcement Tactical System (LETS) regarding Timothy A. Boyett, which reflect the following:

| | |
|---|---|
| **Name:** | Timothy Alan Boyett |
| **Address:** | 77 Ole Creek Road, Pittsview, Alabama 36871 |
| **SSN:** | 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 |
| **Date of Birth:** | 07/25/1964 |
| **Driver's License#:** | 4859783 (current, valid) |
| **Vehicles Registered:** | 2004 Dodge Ram pickup truck, red in color, Alabama license AN03021; 1998 Jeep Wrangler, green in color, Alabama license 57D127L; 1997 Dodge Intrepid, green in color, Alabama license 57A598G; 1995 Buick Century, gray in color, Alabama license 57D500G. |

28.   Your affiant caused a search to be conducted of automated Russell County Sheriff's Department files concerning Timothy Alan Boyett.  Among these records are entries indicating that Timothy Alan Boyett, 77 Ole Creek Road, Pittsview, Alabama, date of birth July 25, 1964, Social Security Account Number 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, was involved in an automobile accident October 26, 2005.  Boyett's 2004 Dodge Ram pickup truck, Alabama license 57A599G was involved in the accident.

29.   On October 3, 2007 your affiant drove by the residence at 77 Ole Creek Road, Pittsview, Alabama, and observed parked in the driveway of the residence a red Dodge Ram pickup truck.   License plates were not in plain view from the roadway due in part to a tree line

16

separating the residence from the roadway.   However, Timothy Alan Boyett does have a red 2004 Dodge Ram pickup   registered to him at the address.

## DESCRIPTION OF THE PREMISES TO BE SEARCHED

30.    The location 77 Ole Creek Road, Pittsview, Alabama, which is located in Russell County, Alabama, and is thus in the Middle District of Alabama, is a single story skirted trailer home, white or very light grey in color with black shutters, which is used as a residence.   There is a mailbox on the roadway generally in front of the residence bearing the number "77".   A wood fence approximately six feet in height surrounds the rear of the residence.   There is a window air conditioning unit in the far right window facing the front of the trailer from the roadway. Approximately four steps, which appear to be concrete, lead to the front door of the residence, with a silver colored handrail alongside.   The residence is located across the street from a fenced, grassy field.

## CONCLUSION

31.    Based on the aforementioned factual information, your affiant respectfully submits that there is probable cause to believe that an individual who resides at the residence described above is involved in transmitting child pornography.   Your affiant respectfully submits that there is probable cause to believe that an individual residing in the residence described above has violated  18 U.S.C. §§ 2252 and 2252A.   Additionally, there is probable cause to believe that evidence of the commission of criminal offenses, namely, violations of 18 U.S.C. §§ 2252 and 2252A, is located in the residence described above, and this evidence, listed in Attachment A to this affidavit, which is incorporated herein by reference, is contraband, the fruits of crime, or things otherwise criminally possessed, or property which is or has been used as the means of committing the foregoing offenses.

17

32.     Your affiant, therefore, respectfully requests that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment A.


Special Agent Stephen E. McCraney
Federal Bureau of Investigation


Sworn and subscribed before me
this 11th day of October, 2007.


HONORABLE SUSAN R. WALKER
UNITED STATES MAGISTRATE JUDGE

18

## ATTACHMENT A

### LIST OF ITEMS TO BE SEARCHED AND SEIZED

1.      Computer(s), computer hardware, computer software, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that may be, or are used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

2.      Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs, including, but not limited to, P2P software.

3.      Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.      In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.      Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate

19

or foreign commerce by any means, including, but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

6.    Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.    Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to whose with an interest in child pornography.

8.    Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

9.    Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

10.    Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer

storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

11. Any and all cameras, film, videotapes or other photographic equipment.

12. Any and all visual depictions of minors.

13. Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct,   as defined in 18 U.S.C. § 2256(2).

14. Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).